# 14-826-cv(L)

### 14-832-cv(Con)

## In the United States Court of Appeals for the Second Circuit

_____

CHEVRON CORPORATION,
PLAINTIFF-APPELLEE

*v.*

STEVEN R. DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER,
DONZIGER & ASSOCS. PLLC, HUGO GERARDO CAMACHO NARANJO,
AND JAVIER PIAGUAJE PAYAGUAJE,
DEFENDANTS-APPELLANTS

_____

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK*

_____

## BRIEF FOR THE REPUBLIC OF ECUADOR AS *AMICUS CURIAE* IN SUPPORT OF NEITHER PARTY

_____

ERIC W. BLOOM
LAUREN B. SCHUTTLOFFEL
ERIC M. GOLDSTEIN
NASSIM H. HOOSHMANDNIA
*Winston & Strawn LLP*
*1700 K Street, N.W.*
*Washington, D.C. 20006*
*(202) 282-5000*
*ebloom@winston.com*

Counsel for *Amicus Curiae*

JULY 8, 2014

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION AND INTEREST OF *AMICUS CURIAE* ................................ 1

SUMMARY OF ARGUMENT ........................................................... 4

ARGUMENT ...................................................................... 7

I.    The District Court's Criticisms Of The Ecuadorian Judiciary Ignore Principles Of Comity And This Court's Opinion In *Naranjo*, And Were Unnecessary To Resolve The RICO Action ......................................... 7

II.   Extensive Reforms, Through Which The Republic Has Developed A Legal Framework That Promotes Separation Of Powers And Judicial Independence, Reveal The Fallacy Of The District Court's Criticisms .......... 9

      A.    With The Support And Praise Of The International Community, The Republic Enshrined A New Constitution That Enhanced The Judicial System And Fostered Civic Engagement ...................... 10

      B.    The Constitution Enforces Separation Of Powers, Fortifies The Judicial Institutions, And Limits Executive Authority ...................... 12

      C.    Judicial Council Reforms Continue To Strengthen The Judiciary's Independence And Stature ................................. 15

      D.    Chevron's Own Successes In Ecuador's Courts Belie The District Court's Findings That The Judiciary Lacks Independence ................................................................ 19

      E.    Chevron Itself Repeatedly Argued Before U.S. Courts That Ecuador's Judiciary Was Efficient And Fair ...................... 20

III.  The District Court's Conclusions On The Ecuadorian Judiciary Are Based On Unreliable Evidence ...................................... 21

      A.    The Opinions of Álvarez—President Correa's Political Opponent—Are Biased And Unsupported ........................... 22

i

1.      Álvarez is "an avowed political opponent" of the Republic's current administration.............................................22

2.      Álvarez's opinions are premised almost exclusively on newspaper commentaries ...........................................27

B.      The Reports Of The U.S. State Department—Which Chevron Sought Vigorously To Influence Through Lobbying—Were Previously Discounted By Chevron And The Southern District ........28

C.      The Lay Opinions Of Donziger and Ponce Are Insignificant.............31

IV.     The District Court Opinion Reflects Fundamental Misunderstandings Regarding How The Republic's Judiciary Operates .....................................32

A.      Under Ecuadorian Law, Chevron Can—Though Has Chosen Not To—Bring An Action To Set Aside The Environmental Judgment For Fraud................................................................................32

B.      The Appellate Court Properly Adjudicated the Trial Court Judgment Under a *De Novo* Standard of Review ...............................35

C.      The Prosecution Of Two Chevron Attorneys, Along With Ten PetroEcuador And Government Officials, Was A Good Faith Investigation Into Possible Fraud.......................................................37

CONCLUSION ........................................................................................41

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aguinda v. Texaco, Inc.*,
  142 F. Supp. 2d 534 (S.D.N.Y. 2001) .................................................29

*Chevron Corp. v. Naranjo*,
  667 F.3d 232 (2d Cir. 2012) ...................................2, 4, 7, 8, 22, 23

*In re Application of Chevron Corp.*,
  650 F.3d 276 (3d Cir. 2011) ...............................................3, 7, 9, 38

*Republic of Ecuador v. Chevron Corp.*,
  638 F.3d 384 (2d Cir. 2011) ...........................................................23

*Underhill v. Hernandez*,
  168 U.S. 250 (1897)...............................................................2, 4, 7

STATUTES AND RULES

28 U.S.C. § 1782....................................................................................4

Federal Rule of Appellate Procedure 29................................................1

Federal Rule of Evidence 701 ..............................................................31

Freedom of Information Act, 5 U.S.C. § 552 .................................5, 29, 30

OTHER AUTHORITIES

Adam Klasfeld, *Top Lawyer to Ecuador's President Indignant at Barbs by NY Judge*, Courthouse News Service, Mar. 13, 2014, *available at* http://www.courthousenews.com/2014/03/13/66112.htm...................38

Carter Center Press Release (Sept. 8, 2008), *available at* http://www.cartercenter.org/news/pr/Ecuador_090808.html ............11

Carter Center Report (Nov. 30, 2007), *available at* http://www.cartercenter.org/resources/pdfs/peace/americas/Ecuador_Carter_Center_Electoral_Report_FINAL_website.pdf.............................10

Carter Center Report (Oct. 25, 2008), *available at* http://www.cartercenter.org/resources/pdfs/news/peace_publications/election_reports/Ecuador_referendum_report08_en.pdf ..........................................11

European Union Press Release (Sept. 29, 2008), *available at* http://europa.eu/rapid/press-release_IP-08-1431_en.htm?locale=en. ................11

Human Rights Report. Ted Folkman, "Chevron, Lobbying, and Lago Agrio," *Letters Blogatory* (Oct. 4, 2013), https://lettersblogatory.com/2013/10/04/chevron-lobbying-lago-agrio/ ............30

U.S. Dept. of State Human Rights Reports, *available at* www.state.gov/j/drl/rls/hrrpt/. ...........................................................................29

LBG Rejoinder Report, *available at* http://www.ecuador.org/ blog/?p=3813 ........40

Marc Becker, *Ecuador's Referendum Reveals a Fragmented Country* (May 17, 2011), *available at* upsidedownworld.org/main/ecuador-archives-49/3035-ecuadors-referendum-reveals-a-fragmented-country ...........................16

Wikileak Cable 09QUITO225 (Mar. 31, 2009), *available at* http://wikileaks.org/cable/2009/03/09QUITO225.html .....................................27

William Neuman, *In 'Battle' With Media, a New Tactic in Ecuador*, THE NEW YORK TIMES, A10, Mar. 13, 2012, *available at* http://www.nytimes.com/2012/03/13/world/americas/ecuadorean-president-says-he-will-keep-pressure-on-media.html?pagewanted=all&_r=0 ................................................................28

## INTRODUCTION AND INTEREST OF *AMICUS CURIAE*[*]

This is a RICO action.  The appeal presents numerous questions concerning the conduct of American lawyer Steven Donziger and others in the course of their representation of indigenous Ecuadorian plaintiffs pursuing a lawsuit against Chevron Corporation for environmental pollution in Ecuador's Oriente region.

This is *not* a referendum on the Ecuadorian judiciary.  Yet U.S. District Judge Lewis Kaplan reached far beyond the issues presented to unfairly—and unnecessarily—impugn the integrity of the Republic of Ecuador ("the Republic") and its courts.  *Amicus curiae* the Republic is a sovereign State.  What is more, it is a constitutional democracy and a commercial partner of the United States.  Like virtually all Latin American countries, the Republic has undertaken nearly two decades of aggressive legal reforms to modernize its courts and increase the quality, independence, and transparency of its judicial system.  As a result, the Republic is experiencing unprecedented economic growth and legal and political stability.

The Republic has a strong, legitimate interest in ensuring that its judiciary—which Chevron long championed as a preferable forum to a U.S. court—is afford-

---

[*] The Republic files herewith its motion for leave to file this proposed brief pursuant to Fed. R. App. P. 29.  No counsel for a party authored this brief in whole or in part and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief.  No entity or person other than the Republic or its counsel made a monetary contribution to the preparation or submission of this brief.

ed the same respect any State, including the United States, would expect from a sister sovereign.  As the U.S. Supreme Court has long held, "[e]very sovereign state is bound to respect the independence of every other sovereign state[.]"  *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897).  This Court, too—in litigation related to this one, no less—has recognized that "[i]t is a particularly weighty matter for a court in one country to declare that another country's legal system is so corrupt or unfair that its judgments are entitled to no respect from the courts of other nations."  *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012).

Paying lip service to this essential tenet of comity, Judge Kaplan professed to be "far from eager to pass judgment as to the fairness of the judicial system of another country."  SPA430.[1]  But the opinion below belies such reticence.  Rather, it demonstrates a strident willingness to insult a U.S. commercial partner based on nothing more than testimony from an avowed political opponent of the Republic's governing party (Álvarez), the lay opinion of a witness whose testimony Judge Kaplan otherwise rejected (Donziger), and U.S. State Department reports whose import *Chevron* successfully challenged in previous litigation.  And Judge Kaplan does so despite his own determination that the Ecuadorian court decisions were not

---

[1] For convenience, the Republic cites to the parties' appendices where possible (i.e., "A___" (Appendix) and "SPA___" (Special Appendix)), including to the parties' translations therein.  The Republic reserves the right, however, to rely on its own translations in this and any other litigation or arbitration.  Citations to the Republic's Appendix, filed with this brief, appear as "RA___."

2

offered for their truth in the RICO action and would have been hearsay if they had been.  These overreaches are particularly egregious in light of the fact, well known to Judge Kaplan, that the Republic and Chevron are currently in the midst of an international arbitration that *does* focus on, among other subjects, Chevron's challenges to the sufficiency of the Ecuadorian judiciary and the correctness of the Ecuadorian court decisions.  Chevron sought, and in Judge Kaplan found, a friendly forum to issue improper findings that it is already using in the pending arbitration against the Republic.

One of this Court's sister Circuits recently, and correctly, cautioned that "[t]hough it is obvious that the Ecuadorian judicial system is different from that in the United States, those differences provide no basis for disregarding or disparaging that system."  *In re Application of Chevron Corp.*, 650 F.3d 276, 294 (3d Cir. 2011).  Judge Kaplan's willingness nonetheless to take aim at the Republic reflects a surprising disregard for the potential disruptive effect such lack of comity may have on the relationship between the two States.

For reasons more fully set forth below, the Republic respectfully requests that this Court order stricken from the opinion below all statements about the Ecuadorian judiciary or otherwise make clear that the quality and quantity of evidence do not support the District Court's extraordinary findings regarding the Republic and its judiciary.

## SUMMARY OF ARGUMENT

1.  Sovereign states and the decisions issued by their courts are entitled to respect. *Underhill*, 168 U.S. at 252.  This Court has recognized that it might be appropriate to evaluate a foreign judiciary in an action to enforce a decision issued by a foreign court. *Naranjo*, 667 F.3d at 244.  But the RICO action before the District Court did not seek to enforce an Ecuadorian court decision; indeed, Judge Kaplan found those decisions inadmissible hearsay.  Accordingly, the portions of the opinion below that pass judgment on the Ecuadorian judiciary are *dicta*.

2.  What is more, the District Court got its facts wrong.  To some extent this is unsurprising, considering Judge Kaplan did not have before him (nor did he ask the Republic to provide) information regarding the state of the Ecuadorian judiciary, notwithstanding that the Republic previously appeared before him in a related discovery action under 28 U.S.C. § 1782.  The District Court's criticisms of a lack of due process and an overabundance of presidential authority simply ignore or fail to account for the Republic's two decades of successful institutional reforms.  Through a Constituent Assembly process approved by a popular vote and lauded by the international community, the Republic transformed its government generally—including its judiciary, specifically.

With a new Constitution, the Republic's current governmental structure enforces separation of powers, fortifies judicial institutions against internal and ex-

ternal influences, and limits executive authority.  Even before the new Constitution took effect, Chevron had long represented to U.S. courts that Ecuador provided a preferable judicial forum to litigate the underlying environmental dispute.  And Chevron has itself enjoyed numerous victories before Ecuadorian judges, all of which bely the District Court's "findings" of inadequacy.

    3.   The District Court relied exclusively on three inherently unreliable sources of evidence in reaching conclusions about the Ecuadorian judiciary.

*First*, the opinion below sources fifty-three consecutive footnotes in the section on the Ecuadorian judiciary to the "expert" opinion of Vladimiro Álvarez Grau.  This Court previously questioned Álvarez's impartiality, finding that he is a "political opponent" of the current Ecuadorian Administration.  And Álvarez's opinion is itself premised almost exclusively on newspaper commentaries.

*Second*, the District Court looked to U.S. State Department Country Reports, ignoring the undisputed facts that: (a) another Southern District judge previously concluded—as urged by Chevron's predecessor—that these reports are entitled to little weight in assessing Ecuador's judiciary in the context of civil cases; (b) the reports have remained largely unchanged since the days when Chevron lauded the Ecuadorian judiciary as fair and efficient; (c) Chevron vigorously lobbied the State Department regarding the drafting of these reports, as evidenced by e-mails obtained through a Freedom of Information Act ("FOIA") request, while the reports

5

themselves do not fully consider the Republic's recent reforms; and (d) the reports contain positive language, ignored by the District Court, about the Ecuadorian judiciary.

*Third*, despite making it abundantly clear that Donziger's testimony was *not* credible, the District Court chose to credit his (and one of his colleague's) lay opinion to the extent "in line with . . . Álvarez['s]" as to the operations of the Ecuadorian judiciary.  But having taken "expert" testimony on the subject, the District Court was on shaky ground, at best, allowing and relying upon lay testimony on the same subject.  This is all the more so under the facts of this case, where the District Court otherwise failed to credit Donziger's testimony and where Donziger lacked experience with Ecuador's judiciary beyond this one case.

As this and other Circuits have recognized, U.S. courts should not lightly find a sister sovereign's judiciary corrupt or systemically inadequate.  Here, however, the District Court minimized the threshold for making its findings in the first instance, all the while overestimating the probity of the evidence on which it relied. Simply, the testimony of a partisan, the opinion of a lay witness, and reports that both Chevron and the Southern District previously found should be afforded "little weight"—taken individually or collectively—are of neither a kind nor quality sufficient for the District Court to smear a foreign State's judiciary.

6

4. Finally, the District Court's opinion reflects fundamental misunderstandings regarding how the Republic's judiciary operates. Most importantly, the opinion below fails to appreciate the specific mechanism under Ecuadorian law for an aggrieved litigant to bring an action for alleged corruption, fraud, or collusion in prior judicial proceedings. Because of the availability of an action under the Collusion Prosecution Act, Ecuador's appellate courts lack jurisdiction in direct appeals to consider allegations of fraud in the proceedings. As to matters within the scope of their jurisdiction, however, Ecuador's appellate courts provide *de novo* review. Chevron was afforded such review, and the District Court's conclusory finding to the contrary is unsupported by any evidence.

## ARGUMENT

### I.    The District Court's Criticisms Of The Ecuadorian Judiciary Ignore Principles Of Comity And This Court's Opinion In *Naranjo*, And Were Unnecessary To Resolve The RICO Action.

The District Court's commentary regarding the Ecuadorian judiciary is not only inaccurate and based on unreliable sources—it is also gratuitous. Allowing such commentary to remain in the Federal Supplement cannot be squared with the respect owed to another sovereign state, *Underhill*, 168 U.S. at 252, or with the more-recent reminders from this Court and the Third Circuit to the same effect. *See Naranjo*, 667 F.3d at 244; *Chevron*, 650 F.3d at 294.

In *Naranjo*, this Court recognized a limited circumstance in which it might be appropriate to ask whether a foreign judiciary's decisions are entitled to respect, namely, in an action to enforce such a decision. 667 F.3d at 244. The action below did not involve an attempt to enforce any Ecuadorian court judgment. It instead presented the narrower question of whether the indigenous Ecuadorian environmental plaintiffs (the "LAPs") and their representatives committed a fraud on the Ecuadorian trial court in obtaining a judgment against Chevron. The action thus focused on *their* conduct and motives, not on any potential flaws with the judiciary. The District Court even highlighted the Ecuadorian court's lack of knowledge of the actions of Donziger and his colleagues. *See, e.g.*, SPA345 ("Neither the Lago Agrio court nor Chevron knew anything approaching the whole story of the overall Cabrera fraud[.]"); SPA350 (referring to misrepresentations to the court about the impartiality and independence of a court-appointed expert).

Indeed, Judge Kaplan expressly declined to consider the Ecuadorian court opinions for their truth. According to his opinion, the LAPs sought in various ways to rely on the Ecuadorian court opinions but: (1) never formally sought to admit them for their truth; and (2) even if they had been so moved, Judge Kaplan would have deemed the opinions inadmissible hearsay. SPA423.

It follows from this finding that Judge Kaplan should not and could not have evaluated the content or enforceability of those Ecuadorian court decisions—much

8

less evaluated the whole Ecuadorian judiciary.  Despite this, Judge Kaplan reached beyond his charge, inexplicably finding that he was "of course . . . obliged to" "pass judgment as to the fairness of the [Ecuadorian] judicial system[.]"  SPA430.  Tellingly, the Republic did not seek to file a statement of interest below, at least in part because it did not believe it had any direct interests to state.[2]  But Judge Kaplan took advantage of the absence of the sovereign's input to construe differences between the Ecuadorian and U.S. judiciaries as evidence that the former is deficient.  That was improper.  *See Chevron Corp.*, 650 F.3d at 294.

To be sure, many judicial opinions contain *dicta*.  Here, however, the *dicta* serves no function other than to offend a U.S commercial partner and to gratuitously offer Chevron support in a pending international arbitration against the Republic.  It should be stricken to demonstrate that long-standing pronouncements of comity mean what they say.

## II. Extensive Reforms, Through Which The Republic Has Developed A Legal Framework That Promotes Separation Of Powers And Judicial Independence, Reveal The Fallacy Of The District Court's Criticisms.

The District Court concluded: "[t]here is abundant evidence that . . . the [Ecuadorian] judicial system was not fair or impartial and did not comport with the re-

---

[2] In matters potentially implicating the U.S. government's interests, it is common for a court to seek the input of the Justice Department.  As a sister sovereign, the Republic would have expected an invitation to provide an *amicus* submission to the District Court if the integrity of its judiciary were at issue.

quirements of due process," SPA431; the "Ecuadorian judiciary has been in a state of severe institutional crisis for some time," SPA432; the "new . . . constitution further concentrated power in the hands of President Correa," SPA435; and "the rule of law is not respected in Ecuador," SPA440.  In leveling these accusations, the District Court either chose to ignore or did not know salient facts relating to Ecuador's judiciary, including the processes by which its judges are selected, the bodies implementing comprehensive judicial reforms, and the reforms themselves.

Two decades of reforms have enabled the Republic to enhance the quality, independence, and efficiency of its judicial system.  These reforms, which have garnered international acclaim, demonstrate that the District Court's suppositions regarding the Ecuadorian judiciary are simply false.

### A.    With The Support And Praise Of The International Community, The Republic Enshrined A New Constitution That Enhanced The Judicial System And Fostered Civic Engagement.

A new wave of reforms to the Republic's judiciary began in 2008, when a new Constitution came into force as a result of an internationally monitored and acclaimed Constituent Assembly process.

In 2007, 82 percent of Ecuador's citizens approved the creation of a Constituent Assembly tasked with drafting a new constitution.  Carter Center Report (Nov. 30, 2007) at 4, *available at* http://www.cartercenter.org/resources/pdfs/ peace/americas/Ecuador_Carter_Center_Electoral_Report_FINAL_website.pdf.

Thereafter, the Republic held open and democratic elections, monitored by the Carter Center, the Organization of American States, and other U.S. and European organizations, to elect the members of the Constituent Assembly. *See* Carter Center Press Release (Sept. 8, 2008), *available at* http://www.cartercenter.org /news/pr/Ecuador_090808.html.

When the Constituent Assembly completed a draft of the new Constitution, the Ecuadorian people approved it with 63.93 percent voting in favor. Carter Center Report (Oct. 25, 2008) at 3, *available at* http://www.cartercenter.org /resources/pdfs/news/peace_publications/election_reports/Ecuador_referendum_re port08_en.pdf. The Carter Center "congratulate[d] the Ecuadorian people for their democratic participation in the . . . constitutional referendum, which expressed their civic and peaceful will in a transparent manner." *Id*. at 7-8, 14. The European Union likewise praised both the referendum process and the new Constitution, and vowed to support Ecuador's constitutional transition. *Commissioner Ferrero-Waldner on the constitutional referendum in Ecuador*, European Union Press Release (Sept. 29, 2008), *available at* http://europa.eu/rapid/press-release_IP-08-1431_en.htm?locale=en.

The new Constitution ushered in an era of transparency and citizen participation. It established five, rather than three, independent branches of government: the traditional branches (i.e., judiciary, legislature, and executive), plus the Trans-

11

parency and Social Control Branch and the Electoral Branch.[3]  RA45, Constitution of Ecuador (2008) (the "2008 Const."), art. 225.

As to the judiciary, the new Constitution guards against "both internal and external" threats to judicial independence and expressly sanctions breaches of that independence with "administrative, civil, and criminal liability."  RA36, 2008 Const., art. 168.1.  Not only is the Ecuadorian judiciary institutionally independent, but the Constitution also guarantees its "administrative, economic and financial autonomy."  *Id*. art 168.2.  Moreover, the Constitution grants the Constitutional Court (a separate high court tasked with resolving questions of constitutional law) the power of judicial review: it may declare invalid any act by the president or the National Assembly that violates the Constitution.  RA45-46, 2008 Const., art. 436.

### B.  The Constitution Enforces Separation Of Powers, Fortifies The Judicial Institutions, And Limits Executive Authority.

Below, the District Court recited a truncated version of modifications to the judiciary that resulted from the 2008 Constitution.  But that narrative, which merely rubberstamped Chevron's claims, demonstrated an unawareness of the details of the transitional period and the resulting reforms.

---

[3] The Transparency and Social Control Branch enhances citizen participation in government, particularly through the Public Participation and Social Control Council, which is responsible for appointing officials such as the Attorney General and the Comptroller General.  RA37-40, 2008 Const., arts. 204, 208. The Electoral Branch organizes and oversees all electoral processes to ensure fairness and transparency.  RA42-43, 2008 Const., arts. 218, 219.

For example, Judge Kaplan surmised that the Republic "terminated" its Supreme Court justices and subjected them to a lottery such that the new Constitution "further concentrated power in the hands of President Correa."  SPA435.  In actuality, the new Constitution set out a merit-based selection process for all Ecuadorian judges, which meant that the Republic's highest court, the National Court of Justice (previously called the Supreme Court) required new judges.  RA238, Transitional Regime of the 2008 Const., art 21.  To facilitate the transition, the Supreme Court judges remained in place until the Judicial Council (the administrative and disciplinary authority of the judicial system, RA37, 2008 Const., art. 178) could manage the new merit-based selection process.  RA238, Transitional Regime of the 2008 Const., art. 21.  At the same time, the new Constitution reduced the number of high-court judges, from thirty-one to twenty-one, to limit inconsistency in court rulings.  *Id*.

To avoid any appearance of favoritism, the new Constitution called for a lottery to choose which Supreme Court judges would make up the twenty-one-judge transitional court.  *Id*.  All were eligible to re-apply to become members of the new Court.  Certain of the then-Supreme Court judges resigned to protest the reduction in number of positions, but some remained to become transitional judges.  The Constitutional Court approved the selection of the other transitional judges from among associate judges of the Supreme Court (who previously served as alternates

13

in case of a vacancy) and presidents (chief judges) of the Provincial Courts—all of whom had been selected through merit-based processes.  RA127-32, Constitutional Court Interpretative Ruling No. 001-08-SI-CC (Nov. 28, 2008).

During this transitional period, the Republic implemented a transparent, merit-based selection procedure, insulated from political or economic influence. National Court judges were selected based upon educational and professional merit.  *See* RA238, Transitional Regime of the 2008 Const., art. 21; RA37, 2008 Const., art. 183.  Similarly, and contrary to the District Court's assertion that "the Constitutional Court is subject to the *de facto* control of the political branches," SPA435, a qualification commission carrying out the selection process was ultimately responsible for selecting the Court's judges.  RA45, 2008 Const., art. 434. In this way, under the Constitution's merit-based framework and unlike the selection process in the United States, no member of government—not even the President—could independently appoint *any* judge.  *See* RA36 & RA45, 2008 Const., arts. 147, 228.  The same is true for the removal of judges.  *See* RA45, 2008 Const., art. 431; RA31, Organic Code of the Judiciary, arts. 122, 192.  Just like other government officials, under the Constitution, judges are personally accountable for actions or omissions committed in the exercise of their duties, RA45, 2008 Const., arts. 233, 431, and the framework for how they might be removed in the

14

event of wrongdoing is laid out in the civil codes of the judiciary. *See, e.g.*, RA31, Organic Code of the Judiciary, arts. 122, 192.

### C.  Judicial Council Reforms Continue To Strengthen The Judiciary's Independence And Stature.

The District Court's criticism of the Ecuadorian judiciary also targets the Judicial Council, SPA436-38, which acts as the administrative and disciplinary authority over members of the judicial system.  RA37, 2008 Const., art. 178.  The transition resulting from the 2008 Constitution led to a series of judicial councils, called in sequence: the Temporary Judicial Council, the Transitional Judicial Council, and the new Judicial Council.

The Temporary Judicial Council came under heavy public criticism for, among other things, raising its own members' salaries and failing to sanction judges who permitted pre-trial detention periods to lapse, thereby prompting the early release of potential criminals.  *See* RA399, *Judge Removes the Head of the Judiciary Council*, EL TELEGRAFO, July 5, 2011.[4]  As expressly envisaged by the Constitution (RA36, art. 147.14), the President attempted to address these concerns by calling for a referendum, which put to the citizenry the question of whether to dis-

---

[4] The 2008 Constitution expressly permitted the then-existing judicial council to continue in place as the Temporary Judicial Council until the new Judicial Council could be constituted.  RA239, Transitional Regime of the 2008 Const., art. 27.

solve the Temporary Judicial Council and replace it with a new Transitional Judicial Council.  *See* RA321-23, Referendum Decree No. 669 (Feb. 21, 2011).

The Constitutional Court held a well-attended public hearing analyzing the constitutionality of the referendum, which it ultimately ratified in a 146-page considered ruling.  RA380, Decision of the Constitutional Court, No. 001-DCP-CC-2011 (Feb. 23, 2011).  As the date of the vote approached, active campaigns both for and against the referendum sought to persuade voters.  Marc Becker, *Ecuador's Referendum Reveals a Fragmented Country* (May 17, 2011) at 3-5, *available at* upsidedownworld.org/main/ecuador-archives-49/3035-ecuadors-referendum-reveals-a-fragmented-country.  Voters approved the proposal, providing yet another example of dynamic democratic exercise in the Republic.  RA402, Referendum Results, National Electoral Council, Official Registry No. 490 (July 13, 2011).

Implementing the referendum, the Republic disbanded the Temporary Judicial Council and replaced it with the Transitional Judicial Council.  RA238, Transitional Regime of the 2008 Const., art. 20.  The President, National Assembly, and Transparency and Social Control Branch each appointed one of the Transitional Judicial Council's three delegates.  *Id*.  The Transitional Judicial Council promptly moved to its reform agenda, which included administering a merit-based selection process for National Court judges.  RA37, 2008 Const., arts. 176, 183.3.  Additionally, the Transitional Judicial Council called upon the President to declare a State

16

of Emergency to permit the President to release funds needed by the judicial system to carry out the reforms.  RA15, 18, Presidential Decree No. 872 (Sept. 5, 2011) at 1 ("Whereas" clauses), art. 5.  Over the next two years, under the state of emergency, the judiciary received over $1 *billion*—more than double what it received the two previous years, *see* RA61-82, General Budgets of the State (2010-2013), which enabled it to renovate its buildings, incorporate modern technology, increase judicial personnel, and alleviate a crippling backlog of cases, RA263-89, Restructuring Program for the Judiciary, Transitional Judicial Council.  The doubling of the judiciary's budget in a two-year period reflected the Republic's commitment to enhance the judiciary as a full-fledged, independent branch of government.

On January 24, 2013, the Transitional Judicial Council completed its eighteen-month term, relinquishing its responsibilities to the new Judicial Council, whose members had been elected by the Transparency and Social Control Branch. RA318, Citizen Participation and Social Control Council, Resolution No. 004-221-CPCCS-2013.  Specifically, the Citizen Participation and Social Control Council—a body under the Transparency and Social Control Branch—selected individuals from a pool of candidates nominated by the National Court of Justice, the Attorney General, the Public Defender, a delegate of the executive, and a delegate of the National Assembly.  *Id*.  The process involved public examinations, public oversight,

17

and public challenges.  RA333-36, Regulations for the Selection of Judicial Council Delegates (Jan. 17, 2011).

The District Court, for its part, criticized the Transitional Judicial Council's reform efforts by reference to an International Oversight Committee report. SPA437-38.  This Committee—consisting of six Spanish and Latin American jurists serving as "impartial observer[s]"—was invited by President Correa to review the reforms, including the implementation of the merit-based selection process for National Court judges.  RA149, Int'l Oversight Comm. Rpt. (Dec. 13, 2012).  The Republic asked the Committee "to show each and every aspect [of the reforms], both positive and negative, to attain its purpose of strengthening the justice system."  RA150.  Seizing on just one "negative" comment regarding judicial-misconduct suspension procedures, SPA437-38, the District Court attempted to disparage the entire judicial system and *all* the reforms.  In so doing, the District Court ignored the report's ready acknowledgement that the Republic's reform efforts were to "strengthen[] an independent, social, joint, impartial, democratic, equitable, intergenerational, transitional, timely and transparent justice system." RA148, Int'l Oversight Comm. Rpt., *supra*.  The District Court likewise ignored the Committee's conclusion that the reforms vastly *improved* the judicial system:

> [T]he benefits of an overall reform of the justice system, which has revolutionized the judicial scenario to the benefit of the citizens who had been demanding such a change, the majority of whom to this date see it as a posi-

> tive move.  The new face of justice is expressed not only
> in the building and in the judicial personnel themselves,
> but also—and mainly—in the approximation of justice to
> those judged and in the transparency in the exercise and
> application of justice.

RA154.  The Committee explicitly disclaimed any executive interference with its mission.[5]

### D.  Chevron's Own Successes In Ecuador's Courts Belie The District Court's Findings That The Judiciary Lacks Independence.

To hear the District Court tell it, "the house always wins" in Ecuador's courts.  In fact, Chevron has often won there.  In 2000, a Texaco subsidiary and other foreign oil companies won major income-tax cases against the Government.  *See, e.g.*, RA372-75, *TexPet v. Ministry of Energy and Mines* (Oct. 17, 2000).  In 2002, Texaco prevailed against Government motions to dismiss three civil cases pending in the Superior Court of Quito.  RA363-71, Super. Ct. Orders (May 21 & 22, 2002).  More recently, in 2007, Texaco received a US$1.5 million court judgment against the Government.  RA388-89, *Texaco Petroleum Co. v. Republic of Ecuador and PetroEcuador* (Feb. 26, 2007).  In 2008, an Ecuadorian appellate court reversed the dismissal of another multi-million-dollar Texaco case against

---

[5] One Committee member addressed the President's critics at a press conference: "In my opinion, there is no indication, no suggestion, no interference has taken place by the Executive—from the President himself (Rafael Correa) to the last public servant of the Executive—in our work."  RA433, *Garzón rejects any interference by Ecuador in the international oversight committee*, EL PERIÓDICO DE MÉXICO, July 14, 2012.

the Government.  RA350, *Texaco Petroleum Co. v. Ministry of Energy and Mines* (Jan. 22, 2008).  In 2011, the Ecuadorian courts dismissed criminal proceedings against two Chevron attorneys and ten other individuals.  *See infra* Part IV.C.  And even in respect to the judgment entered against Chevron that underlies its RICO claim, the National Court of Justice *halved* the damages awarded.  A3578-84.

### E.    Chevron Itself Repeatedly Argued Before U.S. Courts That Ecuador's Judiciary Was Efficient And Fair.

From 1993 to 2002, in the *Aguinda* litigation, Chevron and Texaco proffered no fewer than *ten* expert affidavits to support their *forum non conveniens* pleadings, affirming under penalty of perjury that Ecuador's justice system was neither corrupt nor unfair, and represented an adequate forum for resolution of the indigenous population's claims.  *See, e.g.*, Appellee's Brief, *Aguinda v. Texaco, Inc.*, No. 2001-7756, 2001 WL 36192276, at *34 (2d Cir. Dec. 20, 2001) ("Ecuador's Constitution guarantees due process and equal protection, and its courts provide important procedural and substantive rights[.]").  Chevron's experts noted that "[d]espite isolated problems that may have occurred in individual criminal proceedings, Ecuador's judicial system is neither corrupt nor unfair.  Such isolated problems are not characteristic of Ecuador's judicial system, as a whole."  RA166-67, Ponce y Carbo Aff. (Feb. 4, 2000) ¶¶ 15, 17.[6]

---

[6] *See also* A381-82, Callejas Aff. (Feb. 4, 2000) ¶¶ 2-4, 6 ("While Ecuador's judicial system is not perfect, it is neither corrupt nor unfair. The specific instances cit-

Chevron made similar representations even after *Aguinda*. In July 2006, Chevron asked a California federal court to stay the environmental claims brought by Ecuadorian plaintiffs because they were similar to those being adjudicated in Lago Agrio. Defs' Amended Mot. to Dismiss Compl. Or, In The Alternative, To Stay, *Jane Doe I v. Texaco, Inc.*, No. 3:06-cv-02820-WHA, 2006 WL 2805514, at *1-2, 5, 9-10 (N.D. Cal. May 25, 2006); Reply in Support of Mot. To Dismiss Compl. Or, In The Alternative, To Stay, 2006 WL 2805516, at *7 (July 6, 2006). Chevron urged the U.S. court to defer to the prospective ruling of the Ecuadorian court, and specifically cited the *Aguinda forum non conveniens* ruling with approval. The Republic's reforms have made the judiciary even stronger and more independent today.

## III. The District Court's Conclusions On The Ecuadorian Judiciary Are Based On Unreliable Evidence.

Beyond being unnecessary, the District Court's conclusions regarding the Ecuadorian judiciary were based on faulty and unreliable evidence: (1) the opinions of Vladimiro Álvarez Grau; (2) U.S. State Department Country Reports, which have remained virtually unchanged since Chevron lauded the Ecuadorian

---

ed in that report are not characteristic of Ecuador's judicial system, as a whole."); RA170-71, Ponce Aff. (Feb. 9, 2000) ¶¶ 5, 7; RA173, Pérez-Arteta Aff. (Feb. 7, 2000) ¶¶ 4, 7; RA174, Pérez Aff. (Feb. 4, 2000) ¶¶ 3-4, 6; A384, Ponce Supp. Aff. (Apr. 4, 2000) ¶¶ 1-2; RA176-77, Espinoza Aff. (Feb. 28, 2000) ¶¶ 2-6; RA181-82, Andrade Aff. (Mar. 30, 2000) ¶¶ 4-7; RA186-87, Jimenez Aff. (Apr. 5, 2000) ¶ 1; RA188, Pérez-Arteta Aff. (Apr. 7, 2000) ¶ 2.

judiciary as efficient and fair; and (3) Steven Donziger's lay opinions of the Ecuadorian judiciary. We explain each in turn.

### A. The Opinions of Álvarez—President Correa's Political Opponent—Are Biased And Unsupported.

No fewer than fifty-two of fifty-three footnotes of the District Court's opinion regarding the Ecuadorian judiciary cite to a single source: Álvarez's "expert" opinion. SPA430-40. The fifty-third footnote cites to Álvarez's opinion, too, along with an additional source Álvarez also cites. SPA438 n.1624. Such reliance on a single source would be troubling under almost any circumstance. But it is particularly suspect here for two reasons. *First*, Álvarez is an avowed political opponent of the Republic's current administration. *Second*, his opinions are premised almost exclusively on newspaper commentaries.

#### 1. Álvarez is "an avowed political opponent" of the Republic's current administration.

Álvarez is a self-proclaimed "critic" of the Republic's current administration. *See* RA92, *Correa Celebrates His Four Years In Office,* El Mercurio, Jan. 15, 2011 ("Álvarez . . . considers himself a 'critic' of [Correa's] socialist Government"). Echoing Alvarez's own admission, this Court too previously recognized that Álvarez is "an avowed political opponent of the country's current President, Rafael Correa." *Naranjo*, 667 F.3d at 238. In an unusual step, the District Court noted this Court's finding but countermanded it, concluding instead that Álvarez

and President Correa "never were political opponents." SPA430 n.1586. The District Court justified its conclusion on the basis that "Álvarez ran for president of Ecuador in 1992 for the Christian Democratic Party at a time when President Correa was not publicly known and his political party did not exist." *Id*. But it cannot be that the universe of "political opponents" is limited to individuals who run for the same office at the same time. Opponents of a head of state come in many forms, including former office holders, current partisans, television personalities, political commentators, business leaders, and academics.[7]

---

[7] Nor is this the only occasion in which the District Court contradicted this Court. In a 2011 decision in a case in which the Republic was a party, this Court found:

> [I]n seeking affirmance of the district court's forum non conveniens dismissal, lawyers from ChevronTexaco appeared in this Court and reaffirmed the concessions that Texaco had made in order to secure dismissal of Plaintiffs' complaint. In so doing, ChevronTexaco bound itself to those concessions. In 2005, ChevronTexaco dropped the name "Texaco" and reverted to its original name, Chevron Corporation. There is no indication in the record before us that shortening its name had any effect on ChevronTexaco's legal obligations. *Chevron Corporation therefore remains accountable for the promises upon which we and the district court relied in dismissing Plaintiffs' action.*

*Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 389 n.3 (2d Cir. 2011) (emphasis added). Finding that Chevron merged *not* with Texaco but with one of its subsidiaries, and that this Court was therefore "misinformed," SPA469 n.1750, the District Court overruled this Court and found that Chevron was *not* bound to Texaco's judicial promises:

Álvarez is a politician-turned-pundit whose weekly editorials make clear his opposition to President Correa and the administration's policies. *See, e.g.*, RA83-84, Vladimiro Álvarez, *Emergency, a style of Rafael Correa*, EL HOY, Mar. 7, 2007 (criticizing President Correa's emergency decrees to revive deteriorating roads, assist those displaced by a volcanic eruption, and aid farmers affected by severe droughts). He ran for President as a Christian Democrat (currently an opposition party to President Correa's ALIANZA País party) and held high-level positions in the Christian Democratic Administrations of former Presidents Mahuad and Noboa. According to Álvarez, the judiciary enjoyed independence only when his party was in power. Álvarez makes this assertion subtly, claiming that "[t]he

---

> [T]he Court holds that (1) Chevron is not bound by any of the statements made in *Aguinda* by Texaco and relied upon by defendants by virtue of any merger, and (2) defendants failed to establish any basis for disregarding the separate corporate existence of Texaco and attributing the statements relied upon to Chevron.

SPA469. Even if this Court had been "misinformed," as a matter of procedure, it was up to Chevron to correct the mistake in the prior case, not a lower court in a subsequent proceeding. But this Court was *not* mistaken. It was "ChevronTexaco" that filed the brief in this Court in opposition to the *Aguinda* plaintiffs. And in that brief, ChevronTexaco represented, unambiguously: "As generally known (and this this Court may take judicial notice), Texaco merged with Chevron Inc. on October 9, 2001, five months after the District Court's decision." *Aguinda* Appellee's Br., 2001 WL 36192276, at *10. In a bid to ensure affirmance of the *Aguinda* dismissal on *forum non conveniens* grounds, ChevronTexaco further represented that it was "in the process of closing down what remains of Texaco's former offices in White Plains, New York." *Id.* Given this, we see no grounds (much less capacity) for the lower court to purport to reverse this Court.

Judicial Branch enjoyed a period of relative stability and independence after the 1997 reform" until 2004—the years flanking Presidents Mahuad and Noboa's consecutive presidencies and, of course, the heart of Álvarez's political career. A1418.[8]  He then declares that, unlike President Correa, Presidents Mahuad and Noboa "were particularly respectful of judicial independence."  Dkt. 56, Álvarez Expert Rpt.

But the seven years Álvarez remembers so fondly in fact was a period of instability in Ecuador's history that thrust him personally into controversy.  During those years, the Republic experienced its worst economic crisis, a coup d'état, and the political instability of six presidencies.  RA126, Luis I. Jácome H, *The Late 1990s Financial Crisis in Ecuador: Institutional Weaknesses, Fiscal Rigidities, and Financial Dollarization at Work*, IMF, Jan. 2004; RA88, *An unstable country that has had seven presidents over a period of just 13 years*, LA TERCERA, Oct. 1, 2010.  Citizens took to the streets in protest, and critics published countless articles criticizing the Governments he served and even Álvarez personally.  *See, e.g.*, RA117-19, Kintto Lucas, *Ecuador Started Demonstrations Seeking to Stop the State Powers*, Inter Press Service News Agency, Jan. 11, 2000;  RA95-101, *Ecuador and the Worst Crisis of the Century*, EL HOY, Nov. 6, 1999.  As the public out-

---

[8] Adopting wholesale Álvarez's contentions, the District Court described those years as "[a] brief period of stability and judicial independence[.]"  SPA432.

cry intensified, Álvarez remained at the center of controversy. He acted not only as President Mahuad's Interior Minister as the economy crumbled, but also as his attorney after the Government fell. RA113, Jamil Mahuad Writ to the National Court of Justice (appointing Álvarez as his defense attorney). Ironically, Álvarez was specifically criticized for his lack of respect for the judiciary and the separation of powers doctrine when he served as Minister of Government. RA437, *Álvarez Reiterates That He Will Not Permit The Transfer Of Aspiazu A*, EL HOY, Sept. 1, 1999 (Referring to Álvarez's interference in a criminal case, the judge declared: "One thing is the Executive branch and another the Judicial branch. They are like water and oil.").

The purpose here is not to denigrate Álvarez, but merely to confirm what this Court has already found: He is a political opponent of the current Government. Had a foreign court found that any U.S. Administration acted corruptly on the basis of one political partisan, neither the U.S. courts nor its political leadership would credit that judicial decision. Judge Kaplan's near-exclusive reliance on Álvarez to make sweeping and uninformed findings against a nonparty, sovereign democracy renders such findings inherently suspect and unsustainable. This is particularly so in light of the fact that *not even Álvarez* would make the "irresponsible" generalization that the District Court did: "[W]hen it comes to independence and impartiality . . . it would be irresponsible from me or irresponsible by anybody

else to generalize that all of the judges and all of the justices, that all of the members of the legal branch are corrupt. That type of generalization is irresponsible." RA2-3, Álvarez Dep. Tr. (Sept. 7, 2011) at 137:21-138:4.

### 2.    Álvarez's opinions are premised almost exclusively on newspaper commentaries.

Even if Álvarez were not a political opponent of the current Government, the absence of objective evidence to support his contentions renders his opinions unreliable.  Álvarez "supports" his opinions with the only validation he can obtain—press articles.  Álvarez's direct testimony cites to some 250 press articles, which account for 92 percent of all his sources.  *See* A1407-74.  By contrast, Álvarez—whose purpose was to criticize the very framework of the Ecuadorian legal system—cites to the Ecuadorian Constitution only *twice* in his 68-page direct testimony. *Id.*

As U.S. officials have explained, the Ecuadorian media are not and do not purport to be politically neutral.  Former U.S. Ambassador to Ecuador Heather Hodges acknowledged in a confidential cable later made public that "[t]here is more than a grain of truth to Correa's observation that the Ecuadorian media play a political role, . . . the role of the opposition" since "[m]any media outlet owners come from the elite business class that feels threated by Correa's reform agenda, and defend their own economic interests via their outlets."  Wikileak Cable 09QUITO225 (Mar. 31, 2009), *available at* http://wikileaks.org/cable/2009/

27

03/09QUITO225.html.  The *New York Times* remarked similarly that "[m]any Ecuadoreans agree with Mr. Correa that the media has long reflected the interests of the country's leading families."  William Neuman, *In 'Battle' With Media, a New Tactic in Ecuador*, THE NEW YORK TIMES, A10, Mar. 13, 2012, *available at* http://www.nytimes.com/2012/03/13/world/americas/ecuadorean-president-says-he-will-keep-pressure-on-media.html?pagewanted=all&_r=0.  That Álvarez can find 250 articles from like-minded political opponents of the current Government speaks more to the freedoms enjoyed by the President's critics than to the merit of their criticism.  This Court can surely take judicial notice that any critic of President Obama, or of former President George W. Bush, could find many hundreds of articles accusing her target of corruption as well.

### B.    The Reports Of The U.S. State Department—Which Chevron Sought Vigorously To Influence Through Lobbying—Were Previously Discounted By Chevron And The Southern District.

Judge Kaplan also relies on various U.S. Department of State Reports submitted by Chevron to corroborate Álvarez's portrayal of the Ecuadorian judiciary.  SPA440-41.  That Chevron would submit these reports is particularly curious given that it previously argued—when it sought dismissal of *Aguinda* on *forum non conveniens* grounds—that these same reports should be discarded as non-probative of the Ecuadorian judiciary.  *See, e.g.*, RA170, Ponce Aff. (Feb. 9, 2000) ¶¶ 5 ("I . . . have reviewed the 1998 Report on Ecuador of the United States Department

of State . . . . Based on my years of practice and experience, I believe that on the whole, Ecuador's judicial system is neither corrupt nor unfair"); *id.* ¶ 7; RA174, Pérez Aff. (Feb. 4, 2000) ¶ 3 ("Notwithstanding the description of events contained in [the 1998] report, Ecuador's judicial system as a whole is neither corrupt nor unfair."); RA166, Ponce y Carbo Aff. (Feb. 4, 2000) ¶ 15; RA176, Espinosa Aff. (Feb. 28, 2000) ¶ 3).   And another judge of the Southern District agreed with Texaco, finding that the reports were entitled to little weight.  *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 545-46 (S.D.N.Y. 2001).

The comments in the reports now cited by Judge Kaplan are no more compelling or relevant today than they were when Texaco persuaded the federal courts to reject them and, on that basis, to dismiss *Aguinda* to Ecuador.  In fact, the State Department's most recent reports present the Ecuadorian judicial system as at least as independent and impartial today as it was when Texaco defended Ecuador's judiciary in *Aguinda*.  *See, e.g.*, 2013 Ecuador Human Rights Report.[9]

Chevron's reliance on these reports is all the more tenuous given its failure to inform the District Court that it had vigorously lobbied the State Department as to the drafting of the reports.  Indeed, Chevron has been lobbying the State Department as it relates to the Lago Agrio and related cases since at least 2005.  According to documents made public last year through a FOIA request, Chevron

---

[9] The Human Rights Reports are available by year at www.state.gov/j/drl/rls/hrrpt/.

sought to influence one Country Report in particular: the Human Rights Report. Ted Folkman, "Chevron, Lobbying, and Lago Agrio," *Letters Blogatory*, https://lettersblogatory.com/2013/10/04/chevron-lobbying-lago-agrio/ (Oct. 4, 2013). As the legal commentator who made the FOIA request noted, "it's a problem for parties to try to influence the content of a country's human rights report and then to cite that report when seeking . . . to persuade a court to refuse recognition and enforcement [of a judgment] if it does not disclose the fact of the lobbying." *Id*.

But Chevron did just that. In a heavily redacted email with the subject "Chevron meeting – how the 2009 HRR now looks," State Department officials ostensibly discussed the draft 2009 Human Rights Report after meeting with Chevron representatives. RA26, State Dep't Email, Doc No. C05427711, FOIA Case No. F-2011-06987 (Sept. 30, 2013). According to those officials, the email was redacted because the materials included "a draft text for a report intended for eventual public dissemination" and the exchanges discussed "suggested revisions to that text and pertaining to other issues related to the concerns of the private sector entity," i.e., Chevron. *See* Folkman, *supra*.

Despite this, Judge Kaplan relied on the State Department Reports in his opinion, specifically the self-serving portions Chevron highlighted. Judge Kaplan appears to have been unaware that the Human Rights Reports elsewhere state, for

example, that with respect to "Civil Judicial Procedures and Remedies," "*[c]ivilian courts and the Administrative Conflicts Tribunal [are] generally considered independent and impartial*." 2008 Ecuador Human Rights Report at 4; 2009 Ecuador Human Rights Report at 5 (emphasis added). Five years later, civil courts are still "generally considered independent and impartial." 2013 Ecuador Human Rights Report at 10.

### C.    The Lay Opinions Of Donziger and Ponce Are Insignificant.

Finally, Judge Kaplan relies on the "outspoken opinions of Donziger and his colleagues" (namely, Alejandro Ponce Villacis), finding that they are "in line with those held by Álvarez." SPA442. But in qualifying Álvarez as an "expert" and finding that an assessment of the Ecuadorian judiciary warrants expert testimony, there is little basis for the District Court simultaneously to have allowed—much less relied upon—the opinions of lay witnesses on the same subject. *See generally* Fed. R. Evid. 701 (substantially limiting admissibility of lay opinion). For his part, Donziger's personal experiences with Ecuador's system of justice are limited to a single case in a single court in Ecuador. Neither Chevron nor the District Court can reasonably "decline[] to credit . . . Donziger's testimony," SPA277—over and over—yet rely on his more bombastic, out-of-court statements when convenient, especially where the witness has little relevant knowledge or experience.

31

**IV.    The District Court Opinion Reflects Fundamental Misunderstandings Regarding How The Republic's Judiciary Operates.**

As explained above, Chevron sought out a favorable forum to obtain findings it has already begun to use in the international arbitration against the Republic.  The District Court, fulfilling Chevron's wishes, chose to make far-reaching judgments based primarily on the opinions of a single partisan.  It is unsurprising, especially in a proceeding in which the Republic was not a party, that the District Court was ill-informed on matters of Ecuadorian legal procedure.

**A.    Under Ecuadorian Law, Chevron Can—Though Has Chosen Not To—Bring An Action To Set Aside The Environmental Judgment For Fraud.**

The District Court's decision fails to recognize the process by which an aggrieved litigant in Ecuador may seek reversal of a trial court judgment based on allegations of corruption, fraud, or collusion.

Under the Collusion Prosecution Act ("CPA"), any party claiming to be the victim of a corrupt legal proceeding may attack the allegedly fraudulently obtained judgment—collaterally, not in a direct appeal.  The District Court criticized the Lago Agrio Appellate Court and the National Court of Justice for failing to address Chevron's fraud claims.  SPA298-300, 302-04.  But had these courts done so, they would have exceeded the scope of their respective, limited jurisdictions.  As the Appellate Court stated, it has no jurisdiction "to rule on the conduct of counsel, experts or other officials or administrators and auxiliaries of justice."  A462, Ap-

32

pellate Court Decision.  In Ecuador, appellate courts review cases *de novo*, *see Na-*

*ranjo*, 667 F.3d at 237, but may consider only the evidence properly in the underly-

ing record—not extrinsic evidence of fraud.[10]  Under Ecuadorian law, evidence is

properly entered into the record only if it comports with the evidentiary motions

filed by the parties at the appropriate time—in the case of the Lago Agrio Litiga-

tion, six days after the conciliation hearing that occurred at the outset of the case.[11]

Chevron did not include—and indeed could not have included[12]—its allegations of

fraud in its evidentiary motions.  Therefore, the Appellate Court had no jurisdiction

to consider them.

---

[10] *See* RA59, Ecuadorian Code of Civil Procedure, art. 334 ("The judge before whom the referred appeal is lodged may confirm, reverse or amend the ruling under appeal based on the merits of the proceedings, including when the lower court judge has omitted a decision on one or several of the disputed points in his ruling.").

[11] *Id.* art. 836 (In summary verbal proceedings like the Lago Agrio Litigation, "if no agreement between the parties has been reached, and if the parties claimed facts that must be justified, the judge, in the same conciliation hearing, shall open the cause to evidence for a term of six days."); art. 117 ("Only properly produced evidence, i.e., evidence requested, presented and examined according to legal requirements, is admissible in court."); art. 119 ("The judge, within the respective term, shall order that all evidence submitted or requested within the same term, be examined prior to notice to the opposing party.").

[12] As the District Court noted, neither the Appellate Court nor the National Court could have considered Chevron's allegations that the LAPs ghostwrote the Ecuadorian court judgment because Chevron's star witness, Alberto Guerra Bastidas (whose testimony Chevron has bought through payments and financial benefits likely totaling more than $2 million), "had not yet come forward when Chevron filed its appeal."  SPA429 n.1579.

Though the Appellate and National Courts lacked jurisdiction to consider Chevron's fraud claims, Ecuadorian law still afforded Chevron, and all alleged victims of judicial misconduct, a legal avenue to challenge the propriety of judicial decisions.  In affirming the Appellate Court's lack of jurisdiction over Chevron's fraud claims, the National Court all but encouraged Chevron to bring a CPA claim:

> When collusion is an independent action governed by our Ecuadorian legislation, it is so regulated under the Collusion Prosecution Act; and, as stated by this Division of the Court, it is not possible to seek the cassation of a judgment by making these kinds of allegations . . . . Therefore, the affirmation made by the court of appeals is the correct one, as it is not within its scope of that court to have jurisdiction to hear collusive action cases[.]

A3543, National Court Decision.

The CPA's plain text demonstrates its applicability here.  Under Article 6, an aggrieved party alleging that a proceeding has been tainted by fraud may bring an action, and "[i]f the grounds for the claim are confirmed, *measures to void the collusive proceeding will be issued, invalidating the act or acts*, . . . and redressing the harm caused, . . . and, as a general matter, restoring the things to the state prior to the collusion."  RA443, Collusion Prosecution Act, art. 6 (emphasis added).[13]

---

[13] Under CPA Article 10, a party has five years from the date of the alleged collusive act—here the February 14, 2011 issuance of the judgment against Chevron—to bring a complaint.  RA444.

A CPA action alleging a "collusive" proceeding affords Chevron the opportunity to, among other things, fully brief the issues, present evidence, and participate in a hearing.  RA442, Collusion Prosecution Act, arts. 4, 5.  The remedies available to Chevron under the CPA include nullification of the judgment, as well as damages, imprisonment, and disciplinary proceedings against those involved. RA443, Collusion Prosecution Act, arts. 6, 7.

As the Republic was not a party to the RICO action, the District Court may simply have been unaware of the importance of the CPA when it rendered its Opinion.  But Chevron was not:  It referenced the CPA numerous times in its RICO filings, pointing to it for other purposes while ignoring its role as the proper mechanism for alleging fraud.  *See, e.g.*, Dkt. 658-3, Ponce Expert Rpt. at 8; Dkt. 1411, Notice of Intent to Raise Issues of Foreign Law at 2, 4, 8.  Moreover, Chevron's attorney for its National Court appeal, Santiago Andrade, is a former Ecuadorian Supreme Court judge who himself has issued multiple rulings under the CPA nullifying "collusive" proceedings.  *See*, *e.g.*, RA414, Supreme Court Decision, File No. 162 (Sept. 17, 2002); RA408, Supreme Court Decision, File No. 83 (May 10, 2001).

### B.    The Appellate Court Properly Adjudicated the Trial Court Judgment Under a *De Novo* Standard of Review.

Without citation to authority, the District Court adopted Chevron's contention "that it would have been impossible for any court to have conducted a *de novo*

review of the 188-page Judgment and the trial record in the time the appellate court rendered its decision." SPA427. It based its conclusion on the premise that "on January 3, 2012—only five weeks after the three member appellate panel was selected—the appellate court affirmed the Judgment." SPA427-28 (footnote omitted).

The facts belie Judge Kaplan's conclusion. As Chevron has admitted in the ongoing international arbitration between it and the Republic, appointments to the appellate panel were made as early as March 24, 2011, and even accounting for changes in the panel's membership, each judge had at least 147 days (approximately five *months*, not five weeks) to examine the record and resolve the appeal.[14] Nor is there any requirement that an appellate judge review every page of the record while crafting the opinion. Here, the appellate court had no reason to review parts of the record that were irrelevant to the issues on appeal, or which might otherwise have been duplicative or cumulative.

The Appellate Court's decision was 16 pages. By comparison, the District Court below issued a 485-page Opinion and 85-page Appendix just six weeks after receiving the final post-trial memorandum in a case that amassed more than 3,750 exhibits totaling more than 82,800 pages, and which included a 2,969-page trial

---

[14] Appellate panel Presiding Judge Toral, and Judges Encarnación and Legna, spent 287, 246 and 147 days, respectively, examining and resolving Chevron's appeal. *See* RA4-25, 201-33 (establishing judges' appointment dates).

transcript, 1,033 pages of written direct testimony, and 7,340 pages of deposition designations.

### C. The Prosecution Of Two Chevron Attorneys, Along With Ten PetroEcuador And Government Officials, Was A Good Faith Investigation Into Possible Fraud.

The District Court's analysis of the criminal investigation of two Chevron attorneys, SPA131-37, again ignores facts it either did not know or chose to discard. Its suggestion that the Republic helped the LAPs pressure Chevron by prosecuting Chevron's attorneys, *ibid.*, finds no support in the record.

In 1998, following limited remediation completed by TexPet, a subsidiary of Chevron's predecessor, the Republic released TexPet from claims the Republic could have brought against it resulting from TexPet's pollution of the Oriente. In 2001, criminal authorities in the Republic began an investigation that ultimately reached twelve individuals, including government officials, officials of the State-owned oil company, and two Chevron attorneys, for making material misrepresentations relating to the remediation. *See* A2149-54 (complete chronology of relevant events).

Whatever *the LAPs'* motives in referring their allegations about Chevron's attorneys for prosecution, the District Court found no evidence that *the criminal authorities in Ecuador* acted in bad faith. The most Judge Kaplan could do was suggest that the initial refusal to terminate the investigations, as recommended by a

37

former Ecuadorian prosecutor, was tied to Rafael Correa's election as president.  A careful examination of the facts, however, shows that the former prosecutor had investigated allegations of forgery, but had never investigated whether the subjects had deliberately made materially false statements to the Government in connection with the remediation.  *See* A2151.

Reaching for any semblance of cronyism, the District Court adopted Chevron's representation that the criminal prosecutor, Washington Pesántez, had been President Correa's college roommate.  SPA134.  As a threshold factual matter, this statement is simply wrong.  The two were never roommates, although they did attend the same university.  *See* Adam Klasfeld, *Top Lawyer to Ecuador's President Indignant at Barbs by NY Judge*, Courthouse News Service, Mar. 13, 2014, *available at* http://www.courthousenews.com/2014/03/13/66112.htm.

More to the point, however, and as the Third Circuit observed in responding to Chevron's identical attack there, it is not unusual for presidential transitions, including in the U.S., to "include the replacement of high-level officials, oftentimes with persons who are friends, or have an even closer relationship to the incoming president" and to result in "a shift in priorities along with a change in the presidential administration."  *In re Chevron Corp.*, 650 F.3d 276, 293-94 (3d Cir. 2011); *see id.* ("Moreover, it is not uncommon for an American president to comment on ongoing criminal prosecutions and even urge that alleged wrongdoers be prosecut-

ed in accord with the president's priorities."). There is no evidence of any irregularity regarding Pesántez's appointment. Rather, as the document cited by the District Court makes clear, Pesántez was appointed as a matter of course along with six other high-level officials, including the Attorney General and Controller General. RA141, Constituent Mandate, art. 8.

Excluding Chevron attorneys from the scope of this investigation would have afforded them an unprecedented immunity that the other investigative subjects did not enjoy. Among those targeted by the investigation were the former Minister of Energy and Mines and the former Executive President of PetroEcuador. Chevron's agents should not have been and were not singled out either for selective prosecution or special treatment. Regardless, Judge Kaplan had no grounds to assume that the criminal investigation lacked a factual predicate or otherwise was pursued illegitimately, given the overwhelming evidence of contamination (which, incidentally, Judge Kaplan expressly declined to consider, SPA316). In fact, environmental experts conducting an independent investigation on behalf of the Republic in the international arbitration have found not only that there is substantial evidence that TexPet's pollution continues to exist in the Oriente and continues to harm people and the environment, but also that Chevron did everything in its power to conceal this pollution from the Lago Agrio Court. *See* A2281-2483;

*see also* LBG Rejoinder Report, *available at* http://www.ecuador.org/blog/?p=3813.

At the end of the day, the criminal charges against Chevron's attorneys were dismissed. Judge Kaplan nonetheless speculates, SPA137 n.520, that the dismissal was a function of *the LAPs'* changing priorities. There is absolutely no evidence that the LAPs had any involvement at all in the court's decision. The dismissal came over the objections of the Prosecutor General, who then appealed the dismissal, only to have it affirmed by a higher court. *See* RA248, National Court of Justice Order (Aug. 9, 2011). In speculating as to the Ecuadorian court's motives, the District Court below reverses the oft-cited presumption of regularity of government officers, and does so in the absence of any evidence that supports its own conjecture.

## CONCLUSION

Whether or not this Court upholds Judge Kaplan's findings on the merits of this RICO action, his unnecessary and unfounded commentary about the Ecuadorian judiciary should be declared improper and stricken from his opinion.

Respectfully submitted,

 /s/ Eric W. Bloom
ERIC W. BLOOM
LAUREN B. SCHUTTLOFFEL
ERIC M. GOLDSTEIN
NASSIM H. HOOSHMANDNIA
Winston & Strawn LLP
1700 K Street, N.W.
Washington, D.C. 20006
(202) 282-5000
ebloom@winston.com

Counsel for Amicus Curiae
The Republic of Ecuador

JULY 8, 2014

41

No. 14-826-cv(L); 14-832-cv(Con)

# In the United States Court of Appeals
# for the Second Circuit

_____

CHEVRON CORPORATION,
PLAINTIFF-APPELLEE

*v.*

STEVEN R. DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER,
DONZIGER & ASSOCS. PLLC, HUGO GERARDO CAMACHO NARANJO,
AND JAVIER PIAGUAJE PAYAGUAJE,
DEFENDANTS-APPELLANTS

_____

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
28.1(e)(2) or 32(a)(7)(B) because:

☒    this brief contains 9,448 words, excluding the parts of the
brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☒    this brief has been prepared in a proportionally spaced typeface
using Microsoft Office Word 2010 in 14-point Times New
Roman.


/s/    *Eric W. Boom*
ERIC W. BLOOM
*Counsel for* Amicus Curiae
*The Republic of Ecuador*

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2014, I caused to be filed a copy of the foregoing via CM/ECF, for the U.S. Court of Appeals for the Second Circuit. All participants are registered CM/ECF users and will be served by the CM/ECF system.


/s/  *Eric W. Bloom*
ERIC W. BLOOM